# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

DEBORAH J. NOVAK,

      Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of the Social Security
Administration,

      Defendant.

No. C05-0169

**ORDER**

_____

This matter comes before the court pursuant to briefs on the merits of this application for disability insurance benefits. On January 5, 2006, the parties consented this matter to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (docket number 11). The final decision of the Commissioner of Social Security is affirmed and this matter is dismissed.

## I. PROCEDURAL BACKGROUND

Plaintiff Deborah Novak applied for Supplemental Security Income benefits and Social Security disability benefits on November 8, 2001, alleging an inability to work due to disability due to paranoia, anxiety, allergies, and asthma since November 15, 1999. (Tr.50-52; 324-326). The Social Security Administration denied benefits to Ms. Novak after her first application (Tr. 38-41) and denied benefits again after reconsideration. (Tr. 44-47). Ms. Novak requested a hearing before an administrative law judge. (Tr. 48-49). Administrative Law Judge (ALJ) John P. Johnson heard Ms. Novak's appeal on May 26, 2004. (Tr. 332). The ALJ denied Ms. Novak's appeal in a decision dated May 19, 2005. (Tr. 13-26). The Appeals Council denied Ms. Novak's request for review on

August 26, 2005. (Tr. 7-9). Ms. Novak filed this action for judicial review on October 24, 2005 (docket number 3).

## II. FACTUAL BACKGROUND

### A. Relevant Medical History

The record contains extensive treatment notes for Ms. Novak, covering her initial treatment and then focusing on her psychiatrist and social worker visits from June of 1998 through January of 2004. Ms. Novak also visited the Family Practice Center (FPC) in Cedar Rapids from July of 2000 through June of 2001. (Tr. 192-199). On July 24, 2000 Ms. Novak called the FPC stating that she had broken out in hives due to exposure to perfume. The FPC advised her to take over-the-counter medication to deal with the symptoms. (Tr. 197). When Ms. Novak called in a few days later, Dr. Nelson prescribed a refill of Ms. Novak's Albuterol. (Tr. 197). Ms. Novak denied anxiety and mood problems at that time. On February 26, 2001 Ms. Novak visited the clinic and reported hot flashes. (Tr. 195). Ms. Novak felt she had a social phobia as her hands and face became red in crowds, but not at home or with her family. (Tr. 195).

Ms. Novak first sought treatment for mental health issues on May 16, 1996. (Tr. 189). Ms. Novak had developed acute paranoia about a fellow classmate at Kirkwood College. (Tr. 190). She thought that her classmate had rebuilt his face, continually wiped his fingerprints, was in the Mafia, and trying to kill her. (Tr. 190, 159). Dr. Alan C. Whitters, a psychiatrist at the Abbe Center for Community Mental Health (Abbe Center), diagnosed Ms. Novak with delusional disorder, R/O paranoid schizophrenia, and R/O drug induced psychosis (denied by Ms. Novak). (Tr. 191). Dr. Whitters found that Ms. Novak possessed mild to moderate psychosocial stressors associated with financial and educational stress. (Tr. 191). Dr. Whitters rated Ms. Novak's Global Assessment of Functioning (GAF) at 55 with her highest in that past year being 85. (Tr. 191).

Ms. Novak continued to seek treatment at the Abbe Center. Dr. Whitters treated her until he left the Abbe Center in July of 2001. (Tr. 189-191, 204-54, 280-294, 302-320). After Dr. Whitters left, Dr. Muhammed Kamran treated Ms. Novak until her transfer to Dr. Ali Safdar on October 22, 2001. According to the record, Dr. Kamran continued to treat Ms. Novak up until her Social Security hearing and presumably currently treats her as well. In addition, Ms. Novak met with different social workers through the Abbe Center.

Throughout Ms. Novak's treatment, she experienced difficulties adjusting to various medications and requested changes to her treatment plan. She also independently adjusted, or stopped taking, her medication at times. Ms. Novak sought to change her medication from Perphenazine to another medication on June 3, 1998 because she had been having problems choking on food and feeling that her tongue was not functional. Dr. Whitters decided to prescribe Zyprexa as a trial instead of the perphenazine. (Tr. 211). On July 22, 1998 Ms. Novak reported increasing problems with recent thoughts, difficulty functioning and indicated that she had some paranoia. She requested medication other than Zyprexa. (Tr. 210). Dr. Whitters started Ms. Novak on Risperdal. (Tr. 210). On November 18, 1998 Ms. Novak noted that her current medication helped her racing thoughts and mood. (Tr. 205). Dr. Whitters indicated on his report that her mental status indicated no psychosis or lethality and that she seemed stable. (Tr. 205).

On December 4, 1998 Ms. Novak informed social worker Amy Kakavas that she had gone two days without any medication as she was feeling over-medicated. (Tr. 204). Ms. Kakavas noted that Ms. Novak "seem[ed] to feel comfortable doing a little bit of her own med (sic) management." (Tr. 204). Ms. Kakavas advised her not to alter her medication without consulting Dr. Whitters. (Tr. 204). Ms. Kakavas also noted that Ms. Novak's mental status seemed normal with no indication of any psychosis. (Tr. 204). Ms. Novak's DSM-IV diagnosis remained the same and her GAF set at 65. (Tr. 204). On August 26, 1998 Ms. Novak reported to Ms. Zobl that she was doing very well

generally, watching a lot of movies, and playing golf. (Tr. 208). On September 7, 1998 Dr. Whitters indicated Ms. Novak was stable except for having problems with increasing weight, sedation, and mild depression. (Tr. 207).

On January 13, 1999 Ms. Novak indicated that she had stopped taking Zyprexa as she felt it was not working, stopped taking all medication for two days, and felt "somewhat high." (Tr. 224). Dr. Whitters decided to switch Ms. Novak back to Perphenazine. (Tr. 224). On February 3, 1999 Ms. Kakavas commented that Ms. Novak's mood seemed "very good and stable" and exhibited "no indication of any symptoms at this time." (Tr. 223). On February 10, 1999 Ms. Novak discussed the possibility of doing the books for a gas station. (Tr. 222). Ms. Novak hoped to get this position because she noted that "her pattern is typically to avoid most social situations and that she would prefer working out of her home." (Tr. 222). Ms. Kakavas opined that Ms. Novak had attained most of her goals as Ms. Novak continued to take classes and swing-dance classes. (Tr. 222).

On March 18, 1999 Dr. Whitters noted that Ms. Novak's sleep, appetite, energy, and concentration were intact. (Tr. 221). Ms. Novak reported that she was doing well generally, she continued to swing-dance, and volunteered in Marion as part of a government class. (Tr. 221). On March 22, 1999 social worker Martha Zobl indicated that Ms. Novak "[d]idn't seem anxious nor depressed and [she was] definitely not paranoid." (Tr. 220). However, Ms. Zobl noted:

> At times she can be having problems and people are not too aware of it. She was an A and B student working very hard. Now she's a C student, but she's doing this by design. This is something that one wants to assess periodically to make sure it's not decompensation. (Tr. 220).

On April 28, 1999 Ms. Novak related places and times she would like to work, as she was unemployed. (Tr. 219). Ms. Zobl noted that Ms. Novak had "a lot of parameters" and "[o]ne thing [is that] she doesn't really want to go to work and realizes though that her mother is not going to keep helping her." (Tr. 219). Ms. Novak indicated that she was not having any anxiety problems, but realized it could happen again and thus

4

knew she needed to take her medicine. (Tr. 219). Ms. Zobl noted, "I frankly wondered why though she brought it up." (Tr. 219). School was going well for Ms. Novak and she continued to attend her dances. (Tr. 219).

On May 13, 1999 Ms. Novak reported that she was generally doing very well. (Tr. 218). Her sleep, appetite, energy, and concentration remained intact. (Tr. 218). Dr. Whitters found her stable with no psychosis or lethality. (Tr. 218). On May 19, 1999 Ms. Zobl noted that although Ms. Novak's temporary job had ended, she was still going to her swing group and playing golf. (Tr. 217). Ms. Zobl noted that all of Ms. Novak's symptoms had been reduced and she had no thought or perceptual content. (Tr. 217). She set Ms. Novak's GAF at 75. (Tr. 217).

Ms. Novak informed social worker Paula Krings on June 14, 1999 that her symptoms of psychotic disorder, difficulty with social interaction, and tendency to isolate herself socially were under control under her current medication (Perphanzine). (Tr. 215). Ms. Novak noted that she was having difficulties dealing with "small talk" and enjoyed the fact that her current office co-workers were quiet and less interested in conversing. (Tr. 215). Ms. Krings indicated that there was "no current evidence of any delusions or hallucinations" and that Ms. Novak did not indicate any unusual thinking patterns. (Tr. 215). Ms. Krings set Ms. Novak's GAF at 65, with her highest GAF in the past year as 65-70.

On July 14, 1999 Ms. Novak noted that she feels very uncomfortable whenever she tried to reduce intake of Perphenazine. (Tr. 214). When she reduced the medication, she had racing thoughts. (Tr. 214). Ms. Novak further noted that although she had heard voices and been paranoid in the past, such symptoms were not a significant problem at that time. (Tr. 214). Dr. Whitters reported that Ms. Novak appeared stable and advised her to continue on Perphenazine. (Tr. 214). On August 9, 1999 Ms. Novak noticed increased levels of tension and occasional periods when her thoughts raced. (Tr. 213). Ms. Krings and she discussed methods to manage her stress level. (Tr. 213). Ms. Krings reported

that Ms. Novak's symptoms appeared to be within manageable limits as Ms. Novak was able to maintain her employment and continued to take classes at Mount Mercy College in pursuit of her accounting degree. (Tr. 213). On September 6, 1999 Ms. Novak indicated no problems sleeping and Dr. Whitters noted that she appeared stable. (Tr. 212).

On May 11, 2000 Ms. Novak noted that her current medication combination generally worked to control her symptoms. (Tr. 237). On October 11, 2000 Ms. Novak indicated that she stopped taking the medication Seroquel for a few days because she felt that she had a tremor in her right hand and arm which she felt was getting worse. (Tr. 230). She feared that this indicated tardive dyskinesia. (Tr. 230). Although the tremor seemed to improve immediately, she still had "a lot of anxiety and discomfort." (Tr. 230). Dr. Whitters advised her that he did not feel that her symptoms reflected tardive dsykinesia and altered her medication. (Tr. 230). He noted that Ms. Novak "still seemed paranoid, obsessive, and anxious." (Tr. 230). On September 25, 2000 Ms. Novak reported that she didn't feel "right." (Tr. 235). She stated that she felt "very anxious, especially socially," and was having problems with school. (Tr. 235). Ms. Novak stated that she felt that she was choking on food, felt very uncomfortable, and sought additional medication for anxiety. (Tr. 235). Dr. Whitters noted that she did not have any apparent psychosis, but did have some apparent blocking and possible paranoia. (Tr. 235). The doctor changed her medication back to Perphenazine. (Tr. 235).

On September 27, 2000 Ms. Novak self-referred herself to social worker Toni Neta. Ms. Novak sought help because she was have "a lot of difficulty lately in terms of going to school and she thought she needed to talk to somebody." (Tr. 231). Ms. Novak was taking classes at Coe College and experiencing extreme anxiety in one of her classes. (Tr. 231). She felt that "she can't sit close enough to the door," felt tense, and felt as though she needed to get out of the room. (Tr. 231). Ms. Neta noted that Ms. Novak has a history of delusional disorder which appears to be controlled by medication, but due to stress she was experiencing extreme anxiety. (Tr. 231). Ms. Neta also indicated that there

did not seem to be any psychotic symptoms, rather Ms. Novak just felt the need to talk to someone.  (Tr. 231).  Ms. Neta placed Ms. Novak's GAF at 56.  (Tr. 231).

On October 30, 2000 Ms. Novak indicated that she was feeling more comfortable in her classes.  (Tr. 228).  Ms. Neta noted that Ms. Novak had a "slight paranoid flavor to her conversation, but no overt psychosis or ideas of reference."  (Tr. 228).  Ms. Novak did indicate, however, that she obsessively washed her hands while at home and has done so for the last ten years.  (Tr. 228).  Ms. Neta placed Ms. Novak's GAF at 56.  (Tr. 228). On December 4, 2000 Ms. Neta  noted that Ms. Novak "continues to have a rather odd quality about her, and [is] slightly paranoid."  (Tr. 227).  Ms. Novak stated that the medication "really seems to help" and overall seemed to be doing fairly well.  (Tr. 227). Ms. Neta set Ms. Novak's GAF at 56.  (Tr. 227).  On December 6, 2000 Ms. Novak reported that she was generally doing well with sleep, with her appetite, energy, and concentration intact.  (Tr. 225).

On January 31, 2001 Dr. Whitters noted that Ms. Novak's sleep, appetite, and concentration were intact with no recent problems of psychosis.  (Tr. 254).  On February 7, 2001 Ms. Novak became very anxious while discussing the classes she was taking at Coe College.  (Tr. 253).  Ms. Neta found her "slightly paranoid" and assessed her GAF at 55.  (Tr. 253).

On March 12, 2001 Ms. Novak complained of social phobia and flushing of her skin.  (Tr. 252).  Dr. Whitters gave her samples of Zoloft to try in order to combat social anxiety.  (Tr. 252).  On March 15, 2001 Ms. Novak discussed her family with Ms. Neta and how her past family relationships may relate to her social anxiety.  (Tr. 250). Ms. Neta found her to be doing "pretty well" and set her GAF at 55.  (Tr. 250-51).  On March 21, 2001 Ms. Novak discussed concerns about blushing around other people and her relationship with her mother.  (Tr. 249).  She noted that "she has very little problems except for the relationship with her mother."  (Tr. 249).  Ms. Neta set her GAF at 57. (Tr. 249).

On May 3, 2001 Ms. Neta indicated that Ms. Novak was doing fairly well overall, but that there were indications of some depression. (Tr. 248). Ms. Neta set Ms. Novak's GAF at 58. (Tr. 248). On June 6, 2001 Ms. Novak indicated that she was satisfied with her medication and was stable. (Tr. 247). On July 6, 2001 Ms. Novak transferred to Dr. Muhammad Kamran, a consulting psychiatrist at the Abbe Center. (Tr. 246). Ms. Novak noted that she sometimes hears her mother's voice swearing at her if she only takes one dose of Perphenazine. (Tr. 246). When that happens, she doubles the dose. (Tr. 246). Ms. Novak also noted that she stopped taking Zoloft because "she thinks when she takes Zoloft her mind races." (Tr. 246). Dr. Kamran set her GAF at 70. (Tr. 246). On August 16, 2001 Ms. Novak informed Dr. Kamran that she decided to increase her dosage of Perphenazine from 4 m.g. to 8 m.g. (Tr. 245). She also indicated that she had begun taking Zoloft on her own. (Tr. 245). Dr. Kamran advised Ms. Novak that she may continue to take such dosages, but that she should involve her doctor when making any changes to her medications. (Tr. 245). Dr. Kamran noted that Ms. Novak was not experiencing any psychotic features, hallucinations, or paranoia. (Tr. 245).

On August 30, 2001 Ms. Neta indicated that Ms. Novak was "doing really well, probably the best since I have begun seeing her. (Tr. 244). Ms. Novak indicated that she was taking her medication regularly and that she has made significant improvement. (Tr. 244). Ms. Neta placed Ms. Novak's GAF at 59. (Tr. 244). On September 7, 2001 Dr. Kamran noted that Ms. Novak reported no complaints, her appetite was normal, and she denied any auditory or visual hallucinations. (Tr. 243). He observed no psychotic features. (Tr. 243). On October 4, 2001 Ms. Neta acknowledged that the September 11 terrorist attacks had occurred since their last visit. (Tr. 241). She and Ms. Novak discussed how those events had "stirred up quite a lot of anxiety and some paranoia in her, but she seem[ed] to have calmed down quite a bit." (Tr. 241). Ms. Neta placed Ms. Novak's GAF at 54. (Tr. 242).

On October 22, 2001 Ms. Novak met with Dr. Ali Safdar as a transfer from Dr. Kamran. (Tr. 240). She noted that she was happy with her current medication and was not experiencing any psychotic symptoms, significant depression, or suicidal thoughts. (Tr. 240). On November 19, 2001 Ms. Novak indicated that she was doing fairly well, but expressed frustration over changing psychiatrists since Dr. Whitters left the Abbe Center. (Tr. 239). Ms. Neta noted that Ms. Novak's thought processes were normal and placed her GAF at 54. (Tr. 239).

On February 7, 2002 Ms. Novak was doing "pretty well" with a fairly active routine although still somewhat socially isolated. (Tr. 291). Ms. Neta set her GAF at 56. (Tr. 291). On February 14, 2002 Ms. Novak reported that she was doing and feeling well. (Tr. 290). She denied any paranoia or psychotic symptoms and reported no problems with her medication. (Tr. 290). Dr. Safdar discussed switching Ms. Novak to Seroquel as a trial to see if she could stop taking Perphenazine. (Tr. 290).

On March 7, 2002 Ms. Novak discussed her disability determination rejection with social worker Toni Neta. (Tr. 289). Ms. Neta expressed concern that Ms. Novak would not be able to handle a full-time job given her "propensity to really decompensate under stress." (Tr. 289). Ms. Neta set her GAF at 56. (Tr. 289). On April 4, 2002 Ms. Novak indicated that the medication helps with the delusional part of her symptoms, but she still felt very anxious and socially uncomfortable. (Tr. 288). She also noted that she still washes her hands "up to 50 times a day and is very worried about dust and germs and bugs." (Tr. 288). Ms. Neta set her GAF at 56. (Tr. 288).

On July 3, 2002 Ms. Novak discussed her discomfort in social situations. Ms. Neta noted that when Ms. Novak was taking classes, she "did not really have as many opportunities to socialize" and therefore now that she is "going into the working world that (sic) she is facing some of her anxieties about feeling uncomfortable around people." (Tr. 285). Ms. Neta set her GAF at 56. (Tr. 285). On July 16, 2002 Ms. Novak indicated that she had been taking a little more medication to deal with problems with her

family. (Tr. 287). Dr. Safdar noted that the medication appeared to help her, and that her and sleep and appetite were fairly good. (Tr. 287). On July 31, 2002 Ms. Novak reported that under her current medication she was eating, feeling, and sleeping better. (Tr. 284). On November 6, 2002 Ms. Novak indicated that her current dosage of Perphenazine was not controlling her symptoms, but side-effects increased when she attempted to increase the dosage. (Tr. 283). Dr. Safdar gave her samples of Zyprexa to try in addition to her current medication. (Tr. 283).

On November 25, 2002 Ms. Novak indicated that her medication (Zyprexa) was making her feel anxious and that she was gaining weight due to the medication. Dr. Safdar prescribed Seroquel as a trial replacement. (Tr. 282). On November 27, 2002 Ms. Neta indicated that Ms. Novak was slightly anxious, sometimes gets paranoid, and "things are going on in her head. (Tr. 281). Overall Ms. Neta felt that Ms. Novak was doing well even though the holidays were overwhelming for her. (Tr. 281). She set her GAF at 54. (Tr. 281).On December 18, 2002 Ms. Novak indicated that she was having problems with Seroquel and therefore had stopped taking it. (Tr. 280). After starting the medication, she began hearing a song replay in her mind. (Tr. 280). Once she stopped taking Seroquel the situation improved. (Tr. 280). Ms. Novak also reported that she was feeling paranoid and sometimes agitated. (Tr. 280). Dr. Safdar changed her medication to Ablify. (Tr. 280).

On January 16, 2003 Ms. Novak indicated that she had decreased her dosage of Perphenazine. (Tr. 294). She also indicated that she was hearing things and harbored some paranoia. (Tr. 294). Dr. Safdar instructed Ms. Novak to increase her dosage of Perphenazine back to 8 m.g. (Tr. 294). On February 19, 2003 Ms. Neta noted "a noticeable change in [Ms. Novak's] mental status." (Tr. 293). Ms. Novak reported that she was under a lot of stress after being fired from her janitorial job. (Tr. 293). While at the job, she was concerned about a knife left out on the counter, which appeared to be related to fears she had about a co-worker. (Tr. 293). Ms. Novak indicated that she was

hearing songs play in her head "almost all the time." (Tr. 293). Ms. Neta noted that Ms. Novak "is a very fragile woman who under stress like she's been experiencing since she graduated tends to not be able to function at the level that she had in the past and probably appeared to be functioning much better than she actually was." (Tr. 293).

On March 12, 2003 Ms. Novak appeared extremely anxious and was unable to stay for her entire session with Ms. Neta. (Tr. 292). Ms. Novak indicated that since Dr. Safdar took her off the medication Ablify music has been playing in her head. (Tr. 292). She stated that she did not have paranoia, but was very anxious. (Tr. 292). She also discussed her anxiety over the idea of appearing before a judge for her disability hearing. (Tr. 292). Ms. Neta set her GAF at 50. (Tr. 292). Ms. Neta hypothesized that perhaps school had been an organizing experience for Ms. Novak and now that she no longer was in classes she probably was deteriorating psychologically. (Tr. 292).

On May 1, 2003 Ms. Novak indicated that her anxiety and depression improved with Remeron and Xanax. (Tr. 314). She further noted that she had not been hearing voices and was feeling less paranoid. (Tr. 314). On June 19, 2003 Ms. Novak noted that Xanax helped with her anxiety, but that she still gets "uptight" when she goes outside. (Tr. 313). She informed Dr. Safdar that she "generally doesn't get along with others," but denied any hallucinations at that time. (Tr. 313). Her medication scheme appeared to be working as well. (Tr. 313).

On August 4, 2003 Ms. Novak reported feeling "pretty anxious" with some obsessive-compulsive thinking and behavior. (Tr. 312). She also reported some auditory hallucination. (Tr. 312). Ms. Novak indicated that she stopped taking the medication Remeron due to weight gain. (Tr. 312). Dr. Safdar advised her to start taking Zoloft again to replace Remeron. (Tr. 312).

On September 29, 2003 Ms. Novak indicated that she had become "increasingly more isolative and not functioning the way she had been." (Tr. 309). She noted that her

primary symptom was anxiety, but she was also having "thoughts come into her head that she knows are not true, but she believes them." (Tr. 309). Ms. Neta noted,

> There has been a dramatic deterioration in Deborah since I last saw her six months ago. I feel that she is safe to live by herself, although I do think that her symptoms have increased dramatically.

(Tr. 309).

Ms. Neta set her GAF at 50. (Tr. 309). On October 14, 2003 Ms. Novak met with social worker Carla Levi as a transfer from Ms. Neta. (Tr. 307). Ms. Novak stated that she had to take two Xanax before meeting with Ms. Levi. (Tr. 307). She also indicated that she was still feeling very anxious but still taking her medication regularly. (Tr. 307). Ms. Levi set her GAF at 50. (Tr. 307). On October 27, 2003 Ms. Novak reported that she was doing and feeling "fair." (Tr. 306). On September 15, 2003 Ms. Novak indicated that she was feeling less paranoid and had not been experiencing much in the way of hallucinations. (Tr. 311).

On November 18, 2003 Ms. Novak indicated that her anxiety level was so high that she had to take two Xanax before the meeting. (Tr. 304). She noted that she wants to move out of her father's house because "she's counted 180 bugs in the house and had some psychotic thoughts about the fact that her father had the house insulated a few years back and that it probably broke the bug barrier." (Tr. 304). She also stated that although she used to be able to listen to the 10:00 p.m. news, she has not been able to do so recently because the voices bother her. (Tr. 304). Ms. Novak indicated that her anxiety level had raised and that she tried to cope with her heightened anxiety level by sometimes distracting herself by shopping. (Tr. 304). She also reported that after visiting her mother she hears her mother's voice echoing in her mind. (Tr. 304). Ms. Levi noted that Ms. Novak's insight and judgment were poor at that time. (Tr. 304). Ms. Levi set Ms. Novak's GAF at 50. (Tr. 304). On December 8, 2003 Ms. Novak noted that she had been feeling more anxious and so she increased her dosage of Perhenazine and Xanax. (Tr. 303). She also

indicated problems with sleeping, but noted that her psychotic symptoms have lessened. (Tr. 303).

On January 22, 2004 Ms. Novak noted that she increased her dosage of Risperdal because the lower dosage allowed a lot of "psychotic symptoms." (Tr. 302). She noted that the Xanax helped with her anxiety, but she "still gets a little anxious and apprehensive at times." (Tr. 302).

### B. Plaintiff's Subjective Complaints

On December 11, 2001 Ms. Novak completed a daily activities questionnaire. At that time, she lived with her father. (Tr. 95). She bathed herself, dressed herself, and took care of her hair regularly. (Tr. 95). She noted no problems or changes in self-care when she took her medication. (Tr. 95). Ms. Novak stated that her medication makes her sleep almost 11 hours a day. (Tr. 95). Since Ms. Novak's alleged condition began, she regularly did laundry, washed dishes, changed sheets, ironed clothing, and took out the trash. (Tr. 95). Ms. Novak vacuumed and swept with help or reminders. (Tr. 95). She had never performed other listed household activities involving repairs or outdoor work such as lawn care. (Tr. 95). She prepared meals for herself daily, and shopped for groceries and sewing material without assistance. (Tr. 96). She drove to her hairdresser and to school without help. (Tr. 96).

Interests for Ms. Novak included sewing and watching the news. (Tr. 97). She stated that she could not listen to music as it "repeats over and over in [her] mind." (Tr. 97). She slowly read and remembered material from textbooks. (Tr. 97). Ms. Novak visited her mother once a month, but otherwise did not prefer going out in public. (Tr. 97). She noted that she goes to holiday get-together with her family and to class. (Tr. 97). When questioned as to whether she had problems getting along with others, Ms. Novak stated that she has a tense relationship with her sister. (Tr. 97). She had no relationships with former employers or co-workers. (Tr. 97).

Ms. Novak stated that she has no problems concentrating or remembering, but has trouble deciding whether "something is real or was it a dream." (Tr. 98). She dealt with change by planning far in advance and "anticipat[ing] what is coming." (Tr. 98). Ms. Novak paid no bills. (Tr. 98). Her last comment regarding her questionnaire stated, "I'd like to get Title 19 so I can see my original doctor who left Abbe Center." (Tr. 98).

Eugene F. Novak, Ms. Novak's father, completed a third party daily activities questionnaire on December 12, 2001 on behalf of Ms. Novak. (Tr. 91-94). Mr. Novak's assessment of Ms. Novak's daily activities of bathing, dressing, shopping, and driving largely concurred with his daughter's questionnaire. He had not noticed any change in Ms. Novak's self-care and stated that she has no difficulty sleeping. He noted that Ms. Novak drove 4-5 days per week and could find her way around unfamiliar areas with difficulty. (Tr. 92). She could take her medication independently.

As for hobbies, Mr. Novak noted that his daughter sewed, but more as a necessity. (Tr. 93). He also stated that she spent a lot of time on the computer doing school work, did not listen to the radio, but enjoyed the news and watched the television show "Survivor." (Tr. 93). He indicated that Ms. Novak was able to understand and remember the programs. (Tr. 93). He also noted that she was able to read her assigned text-books, but seemed to read them over and over again. (Tr. 93).

Regarding social function, Ms. Novak visited her mother once a month and her sister two to three times a year. (Tr. 93). Mr. Novak indicated that she had great difficulty going out in public in malls. (Tr. 93). Mr. Novak further stated that she did not do well in group gatherings, i.e. their last family gathering. (Tr. 93). Apparently Ms. Novak mainly spoke with her mother rather than the other family members. (Tr. 93). Ms. Novak rarely got involved socially. (Tr. 93).

Regarding Ms. Novak's employment history, Mr. Novak stated that she rarely was employed and when she was employed she only lasted four to six weeks. (Tr. 93). He stated, "It's either everybody gets on here (sic) nerves, or she gets on everyone else's

nerves." (Tr. 93). Mr. Novak noted that his daughter adequately responds to criticism depending on her mood and the way in which the criticism was presented. (Tr. 93). He stated that she got along with employers and co-workers poorly. (Tr. 93). Mr. Novak explained this by noting, "she is "ok" the first week of employment, by the third week she would be fond of one person, and by the fifth week she quits." (Tr. 93).

As for issues of concentration and focus, Ms. Novak had no problems concentrating or remembering, but adjusted to change poorly. (Tr. 94). Mr. Novak further pointed out that his daughter did not have trouble completing tasks or following directions if it was "important" to her. (Tr. 94). However, Mr. Novak believed that her mental illness affected her ability to hold a job. (Tr. 94).

On April 23, 2002 Ms. Novak filled out another Daily Activities Questionnaire (Tr. 117). She noted that she regularly bathed, dressed herself, and took care of her hair. (Tr. 117). Ms. Novak clarified her self-care issues by noting:

> I bath (sic) and comb my hair once a week. Every task takes
> so long. I wear the same clothes for four days.

(Tr. 117). Ms. Novak stated that the change in her self-care began, "[w]hen I became delusional in 1996, I don't care about my appearance." (Tr. 117). She further noted that she goes to bed at 6:30 or 7:30 p.m. on nights when she is "too nervous" and otherwise goes to bed at 8:00 p.m. (Tr. 117). Ms. Novak sleeps until 6:30 a.m. (Tr. 117). She indicates that she gets up in the morning even if she is still nervous. (Tr. 117). Ms. Novak does laundry once a week, washes dishes every other day, and regularly takes out the trash. (Tr. 117). She rarely changes sheets, irons, or vacuums. (Tr. 117). She mows the lawn with help or reminders. (Tr. 117). Ms. Novak prepares her own meals without assistance. (Tr. 118). She indicated that she shops for groceries once a week, picking a day when she does not feel nervous. (Tr. 118). Ms. Novak drives to classes and to get her haircut. (Tr. 118).

When asked about her current medication, Ms. Novak noted that she has been taking more medication because she has "been more nervous lately" and "[c]ompared to

an average person, [she] act[s] like [she] is drugged." (Tr. 118). Ms. Novak indicates that due to "her sister's negativity" she has limited her hobbies and stopped attending family gatherings. (Tr. 119). She notes that she rarely gets involved socially and only initiates conversations when she is very comfortable with someone. (Tr. 119). Ms. Novak states that she is very careful about what she says, talks as little as possible, and can't take a job where she is supposed to be warm and friendly. (Tr. 119). Regarding relations with former employers, supervisors, and co-workers, Ms. Novak indicates, "They know I am delusional, so they want a limited relationship." (Tr. 119).

Regarding concentration and focus, Ms. Novak indicates that she is a slow reader and change sometimes bothers her. (Tr. 120). She particularly indicated concern about what she should do after she graduated. (Tr. 120). Ms. Novak usually reacts to stress by taking more medication and going to bed. (Tr. 120). She reports no difficulty completing a task or following carefully given directions. (Tr. 120). Ms. Novak's comments that she has "good days and bad days, but an employer wants you to come to work every day." (Tr. 120).

Ms. Novak's father, Eugene Novak, completed another Third Party Daily Activities Questionnaire on April 25, 2002. (Tr. 121). Mr. Novak states that there has been some change in her self-care activities, but cannot pinpoint a time-frame. (Tr. 121). He pointed out that she sleeps too much and spends a great deal of time in her bedroom. (Tr. 121). He largely agrees with her descriptions of "Activities of Daily Living." (Tr. 121). Mr. Novak notes that she sews when she needs something to wear, watches the news, reads the paper. (Tr. 123). He further indicates that Ms. Novak does not like being around people, rarely attends family gatherings, and probably would never become friends with an outgoing person. (Tr. 123). Mr. Novak also notes that Ms. Novak responds poorly to criticism. (Tr. 123). He states that she spends many hours reading and re-reading. (Tr. 124). Mr. Novak notes that she becomes helpless and defensive when under stress and sometimes has trouble completing a task or chore. (Tr. 124). However, she has

a little trouble following directions. (Tr. 124). When asked if he noticed a change in Ms. Novak's condition, Mr. Novak responded that she was "[v]ery troubled a couple months ago and then she tells me she's going to double up on her medication and that troubled me." (Tr. 124).

## C. Hearing Testimony

Ms. Novak did not attend her hearing because she was "too nervous" and instead testified by affidavit and follow-up interrogatories. (Tr. 147-149; 158-66). Ms. Novak stated that her primary problem is with racing sounds, thoughts, and words, i.e. if she hears or reads something then such an action will trigger a song in her mind that will play and re-play. (Tr. 147, 161). She noted that Xanax would sometimes minimize the song, but not stop it completely. (Tr. 147, 160-161). In order to combat the racing thoughts, Ms. Novak states that she keeps her house very quiet, does not listen to the radio or watch TV, and wears ear plugs when she goes shopping in order to drown out the background noise. (Tr. 147). She noted, "It is torture to hear these songs and repetitious thoughts in my head. I cannot relax enough to concentrate." (Tr. 147). She further notes that such problems with racing thoughts have been a problem at work for her in the past, stating the "buzzing from fluorescent lights and the hum of the computer fan can stay with me a long time." (Tr. 147, 162). Ms. Novak noted that she avoided being around people as their voices "reverberate in my brain. (Tr. 148). Ms. Novak stated at her last job she would continue to hear co-workers' conversations long after they finished speaking. (Tr. 147, 162). She indicated that she would have to work in a place that was completely quiet. (Tr. 147, 162).

Ms. Novak also indicated that she had problems with repeatedly washing her hands, as many as fifty times a day. (Tr. 148, 163). She also stated that she has "a lot of problems with bugs and being around bugs" noting that she did not think that she could work during the month of March "because of how nervous the bugs make [her]." (Tr. 148). Weather also appears to bother Ms. Novak. (Tr. 148). She indicates that she

is more nervous and depressed in the winter as it is so cold and dark. (Tr. 148). She states that she only leaves the house when it is sunny and dry, and will not leave if there is even a chance of snow. (Tr. 148, 163).

Ms. Novak indicates that her current medication makes her feel "drugged and lethargic" and lacking in motivation. (Tr. 149). She states that due to this she sleeps long hours and spends half of her day "just sitting" and dealing with racing thoughts. (Tr. 149). Further, Ms. Novak states that her current state of nervousness[1] causes her to feel nauseous much of the time. (Tr. 149, 160). Regarding her ability to work, Ms. Novak stated that she did not think she could work at the present and indicated the following limitations:

> I would need to work somewhere where it was really quiet. I can not hear the radio or any one talking. I would need to work in a cubicle so that I could have privacy and not be so nervous. I do not want to answer the telephone or have to work with the public. It would just make me too nervous. I am nervous about having to drive to work. I live in Springfield and would have to drive on the highway to get to my job. I can not do this if there is a lot of traffic or if the weather is bad, windy, or they are predicting snow.

The medical expert, Phillip Ascheman, M.D., testified that Ms. Novak has psychotic disorder not otherwise specified (NOS) with evidence of intermittent hallucinations, paranoia, and anxiety. He stated that Ms. Novak's impairment caused mild to no restrictions on her activities of daily living in the recent past, as evidenced by her ability to graduate from college and engage in activities such as dancing. Dr. Ascheman indicated that Ms. Novak has had moderate difficulties in maintaining social functioning and mild difficulties in maintaining concentration, persistence, and pace. He noted that

---

[1] When asked in post-hearing interrogatories, "What makes you nervous?" Ms. Novak responded, "Almost everything. Being away from home." (Tr. 160)

Ms. Novak had experienced a decline in functioning due to an exacerbation of her symptoms. Dr. Ascheman stated that the record evidence did not support "C" criteria.

Dr. Ascheman testified that Ms. Novak possessed, at times, the following limitations: moderate limitations in her ability to understand, remember, and carry out simple job instructions; marked limitations in her ability to understand, remember, and carry out complex job instructions, moderate limitations in her ability to interact with others, particularly the public, due to paranoia; and moderate limitations in her ability to respond appropriately to changes in the work setting. (Tr. 21). He noted that she has no limitations in her ability to use good judgment and could have "superficial" public interactions. (Tr. 21). Dr. Ascheman testified that Ms. Novak's post-college deterioration indicated that she would respond favorably to the additional structure that would be imposed by having a job. He further noted that Ms. Novak retained the ability to perform at least simple work tasks despite some record evidence indicating that she had independently modified her medical treatment in the past. (Tr. 21).

The ALJ posed the following hypothetical question to the vocational expert:

> My first assumption is that we have an individual who is 49 years old. She will be 50 years old as of July 16 and was 45 years old as of the alleged onset date of disability. She is a female. She has a high school education, and the record shows that she has graduated from college with a degree in accounting. And she has past relevant work as you've indicated in Exhibit 20E. And she has the following impairments. She has a schizo affective disorder classified as psychotic disorder not otherwise specified, and she has a history of asthma and allergies. And as a result of a combination of those impairments she has a residual functional capacity as follows. She is able to do only simple, routine, repetitive work that does not require constant close attention-- or constant very close attention to detail. She should have only occasional contact with the public, coworkers, and/or supervisors. She should not work at more than a regular pace, and that's using three speeds of pace, being fast, regular, and slow. And she should not work at more that a mild to

moderate level of stress. Would this individual be able to perform any job she previously worked at, either as she performed it, or as it is generally performed within the national economy?

(Tr. 345-346)

The vocational expert testified that Ms. Novak would be able to perform the job of commercial or industrial cleaner under this hypothetical. (Tr. 346). When asked whether Ms. Novak would have any skill acquired from past work which should be expected to transfer to other work within the national economy, the vocational expert responded in the negative as the guidelines of the hypothetical eliminated the use of skills acquired by Ms. Novak in her previous work. (Tr. 347). The vocational expert further testified that Ms. Novak would not be able to perform the full range of unskilled work activity, i.e. She would not be able to work jobs that required repeated exposure to co-workers or supervisors and also would not be able to work any job that required a fast pace. (Tr. 347). The vocational expert indicated that, even given such limitations, qualifying unskilled jobs existed within the economy. (Tr. 347). The expert stated Ms. Novak qualified for such jobs as a newspaper carrier, library aide, and lot attendant. (Tr. 347).

### D.  Competing RFCs

On February 16, 2002 Dr. Dee E. Wright,  conducted a mental residual functional capacity assessment of Ms. Novak. (Tr. 259-264). Dr. Wright found Ms. Novak to be moderately limited in her ability to work in coordination with or proximity to others without being distracted by them and moderately limited in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 259-260). After reviewing Ms. Novak's extensive post-treatment notes from the Abbe Center spanning June 3, 1998 through October 22, 2001, Dr. Wright noted that the record reflects that Ms. Novak appears to respond well to prescribe medication although she experiences "occasional exacerbation of her symptoms when she is unduly stressed." (Tr. 263). Dr. Wright further noted that the file does not indicate that Ms. Novak currently manifests

severe limitations of cognitive function and Ms. Novak "appears capable of performing a range of moderately complex cognitive activity without severe limitation of function." (Tr. 263).

Dr. Wright acknowledged that Ms. Novak "does manifest moderate restrictions of function with social interaction when she is unduly stressed" and "has had difficulties performing activity in settings where she is required to have frequent stressful contact with large numbers of individuals." (Tr. 263). However, Dr. Wright concluded that Ms. Novak "can sustain short lived, superficial interaction with others in appropriate ways when it is in her best interest to do so." (Tr. 263). Dr. Wright found Ms. Novak's allegation credible and that the evidence in her file consistently reflected Ms. Novak's limitations of function as described by Dr. Wright. (Tr. 264). However, Dr. Wright did not find that Ms. Novak's functional limitations met § 12.03 listing severity. (Tr. 264). On July 3, 2002 Lon Olson, Ph.D., also a state agency medical consultant, affirmed Dr. Wrights assessment as written. (Tr. 264).

On August 11, 2003 Dr. Safdar completed a Medical Source Statement of Ability to do Work-Related Activities (Mental). (Tr. 300). On this statement, Dr. Safdar indicated that Ms. Novak had marked[2] limitations in her ability to understand, remember, and carry out detailed instructions; interact appropriately with supervisors; respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting. (Tr. 300). He further stated that Ms. Novak had moderate[3] limitations in her ability to understand, remember, and carry out short, simple

---

[2] The questionnaire defines "marked" as follows: "There is serious limitation in this area. The ability to function is severely limited but not precluded. (Tr. 300).

[3] The questionnaire defines "moderate" as follows: "There is moderate limitation in this area but the individual is still able to function satisfactorily." (Tr. 300)

instructions; make judgments on work-related decisions; interact appropriately with the public; and interact appropriately with coworkers. (Tr. 301).

Prior to the hearing, in a May 5, 2004 letter to the ALJ, Dr. Safdar and Ms. Levi stated that "[d]ue to paranoia and [Ms. Novak's] anxiety symptoms, her ability to keep her appointments or go out into the public has deteriorated over the last few months. Ms. Neta sent a similar letter to the ALJ on May 17, 2004, indicating that due to the severity of Ms. Novak's symptoms, Ms. Novak could not attend the hearing.

After the hearing, on June 14, 2004 Ms. Novak's rehabilitation counselor, Ann Alliger, M.A., wrote a letter to Ms. Novak's attorney regarding Ms. Novak's work abilities and limitations. (Tr. 156). Ms. Alliger had been working as Ms. Novak's rehabilitation counselor since April of 2003. (Tr. 156). During that time period, Ms. Alliger noted that Ms. Novak's "mental health status has often fluctuated."(Tr. 156). Ms. Alliger stated:

> She presents as an extremely frail, soft-spoken woman, for whom the basic daily living activities of life are quite restricted. It is my impression that Deb's mental disability creates broad functional limitations in life areas of interpersonal skills, self-direction, self-cared, work stamina, and communication. In my opinion, there is a very narrow range of jobs within our community that Deb is capable of performing, due to the nature of her limitations. She appears very sensitive to workplace noise, music, pace of work, complexity of work, social interaction, and workplace communication. If she is exposed to too much of any of these characteristics, she reports that she cannot function at all for days. Racing thoughts and "song re-plays" in her mind, as well as anxiety, significantly affect Deb's ability to sleep. When this happens, she often appears unable to perform simple daily tasks.

## II.  CONCLUSIONS OF LAW

### A.  Scope of Review

In order for the court to affirm the ALJ's findings of fact, those findings must be supported by substantial evidence appearing in the record as a whole.  See Lochner v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989).  Substantial evidence is more than a mere scintilla.  It means relevant evidence a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1997); Cruse, 867 F.2d at 1184; Taylor v. Bowen, 805 F.2d 329, 331 (8th Cir. 1986).  The court must take into account evidence that fairly detracts from the ALJ's findings.  Cruse, 867 F.2d at 1184; Hall v. Bowen, 830 F.2d 906, 911 (8th Cir. 1987).  Substantial evidence requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence."  Cruse, 867 F.2d at 1184 (quoting Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)).  The court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence.  Gunnels v. Bowen, 867 F.2d 1121, 1124 (8th Cir. 1989); Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

### B.  ALJ's Disability Determination

Determining whether a claimant is disabled involves a five-step evaluation.  See 20 C.F.R. § 404.1520(a)–(f); Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The five steps are:

(1)     If the claimant is engaged in substantial gainful activity, disability benefits are denied.

(2)     If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe.  If the impairment is not severe, benefits are denied.

(3)     If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity. If the impairment is equivalent to one of the listed impairments, the claimant is disabled.

(4)     If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she performed in the past. If the claimant is able to perform her previous work, she is not disabled.

(5)     If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

Trenary v. Bowen, 898 F.2d 1361, 1364 n.3 (8th Cir. 1990). (citing Yuckert, 482 U.S. at 140–42); 20 C.F.R. § 404.1520(a)–(f).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he is unable to perform his past relevant work." Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995) (citing Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity (RFC) to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education and work experience. Id.

Under the first step of the analysis, the ALJ found that Ms. Novak had not engaged in substantial gainful activity since November 15, 1999. (Tr. 17, 25). At the second step, the ALJ determined that the medical evidence established that Ms. Novak has the severe impairment of schizoaffective disorder. (Tr. 25). The ALJ further found that Ms. Novak's history of allergies and asthma was non-severe. (Tr. 18,25). At the third step, the ALJ determined that Ms. Novak's impairment did not meet or equal the criteria

of any listed impairment. (Tr. 17, 25). At the fourth step, the ALJ determined that Ms. Novak cannot perform her past relevant work. (Tr. 17, 25). At the last step, the ALJ found that Ms. Novak has the residual functional capacity to perform only simple, routine, repetitive work that does not require her to pay constant very close attention to detail. (Tr. 24, 25). Ms. Novak can have only occasional contact with coworkers, supervisors, or the public. (Tr. 24, 25). She cannot work at more than a regular pace and or be exposed to more than a mild to moderate level of stress. (Tr. 24, 25). Considering Ms. Novak's age, education, previous work experience, and RFC, the ALJ determined that Ms. Novak could perform the jobs of newspaper carrier, library aide, and lot attendant and therefore is not disabled. (Tr. 26).

Neither Ms. Novak nor the Commissioner dispute the ALJ's findings regarding steps one, two, and four. Ms. Novak's concerns center upon the ALJ's listing analysis at step three and upon the ALJ's RFC determination at step five.

## C. 12.03 Listing Analysis

Ms. Novak asserts that her schizoaffective disorder and paranoid psychosis meets or equals § 12.03 of the Listing of Impairments found at 20 C.F.R. 404, Subpt. P, App. 1. This listing includes "Schizophrenic, Paranoid, and Other Psychotic Disorders," which refers to the "onset of psychotic features with deterioration from a previous level of functioning." Id. The Commissioner counters that the ALJ thoroughly evaluated all relevant evidence and properly found Ms. Novak not presumptively disabled. Section 12.03 requires that Ms. Novak's impairment either satisfy Subsection A and B requirements, or satisfies Subsection C requirements as follows:

> A.    Medically documented persistence, either continuous or intermittent, of one or more of the following:
>
> 1.    Delusions or hallucinations; or
>
> 2.    Catatonic or other grossly disorganized behavior; or
>
> 3.    Incoherence, loosening of associations, illogical thinking, or poverty of content of speech if associated with one of the following:

        a.     Blunt affect; or

        b.     Flat affect; or

        c.     Inappropriate affect; or

4. Emotional withdrawal and/or isolation;

AND

B.    Resulting in at least two of the following:

    1.    Marked restriction of activities of daily living; or

    2.    Marked difficulties in maintaining social functioning; or

    3.    Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or

    4.    Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors);

OR

C.    Medically documented history of one or more episodes of acute symptoms, signs and functional limitations which at the time met the requirements in A and B of this listing, although these symptoms or signs are currently attenuated by medication or psychosocial support, and one of the following:

    1.    Repeated episodes of deterioration or decompensation in situations which cause the individual to withdraw from that situation or to experience exacerbation of signs or symptoms (which may include deterioration of adaptive behaviors); or

    2.    Documented current history of two or more years of inability to function outside of a highly supportive living situation.

20 C.F.R. Pt. 220, Subpt. P, App. 1, Section 1203.

Evaluation of the severity of a mental disorder requires the application of a "special technique" described in paragraphs (b) through (e) of 20 C.F.R. § 416.920a. Use of this technique helps the ALJ: "(1) [i]dentify the need for additional evidence to determine

impairment severity; (2) [c]onsider and evaluate functional consequences of the mental disorder(s) relevant to [Ms. Novak's] ability to work; and (3) [o]rganize and present [his] findings in a clear, concise, and consistent manner." 20 C.F.R. § 416.920a.

Under this technique, the ALJ first "evaluates [Ms. Novak's] pertinent symptoms, signs, and laboratory findings to determine whether [she] ha[s] a medically determinable mental impairment." 20 C.F.R. § 416.920a(b)(1). In the present case, the ALJ found Ms. Novak to have schizoaffective disorder, a qualifying condition under "A" criteria.

Next, the ALJ must "rate the degree of functional limitation resulting from the impairment." 20 C.F.R. § 416.920a(b)(2). In order to do this, the ALJ must "consider multiple issues and all relevant evidence to obtain a longitudinal picture of [her] overall degree of functional limitation." 20 C.F.R. § 416.920a(c)(1). The ALJ considers "all relevant and available clinical signs and laboratory findings, the effects of [her] symptoms, and how [her] functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment." 20 C.F.R. § 416.920a(c)(1). The ALJ then rates the degree of Ms. Novak's functional limitation "based on the extent to which [her] impairment(s) interferes with [her] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. § 416.920a(c)(2). The ALJ considers the four areas contained in "B" criteria (above).

The ALJ found that Ms. Novak's mental impairment "causes her to have mild to moderate restrictions in her activities of daily living, moderate difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, and pace." (Tr. 21). The ALJ further found that Ms. Novak "has had one or two episodes of decompensation, each of extended duration." (Tr. 21). The ALJ did not find any evidence to support "C" criteria. (Tr. 21).

After rating the degree of Ms. Novak's functional limitations, the ALJ determined the severity of Ms. Novak's impairment. The ALJ found Ms. Novak's condition severe. The next step concerns whether Ms. Novak's impairment meets or equals the § 12.03

listing. 20 C.F.R. § 416.920a(d)(2). This is done "by comparing the medical findings about Ms. Novak's impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder. [The ALJ] record[s] the presence or absence of the criteria and the rating of the degree of functional limitation . . . in the decision." 20 C.F.R. § 416.920a(d)(2).

After weighing the opinion evidence of Ms. Novak's treating physician, "other sources," and medical consultants, the ALJ summarized his findings as follows:

> The claimant's psychological symptoms have ranged over time from anxiety and confusion to paranoia, delusions, and auditory hallucinations. However, an examination of the treatment records indicates that delusions, auditory hallucinations and paranoia have not been the claimant's predominant symptoms.
> The claimant's most predominate (sic) symptom appears to be anxiety. At times, she has exhibited obsessive-compulsive behavior, such as repeatedly washing her hands. She has also exhibited paranoid thinking at times, as well as depression and social isolation. She complains of having racing thoughts in the form of hearing songs over and over again in her head, and hearing voices long after the speaker has stopped talking.

(Tr. 18).

However, the ALJ noted that Ms. Novak has never been hospitalized. He further considered that she completed her college work, obtained her college degree, performed part-time work, volunteer work, and looked for work "after her alleged onset date." Based upon his comparison of medical findings to his rating of functional limitation, the ALJ determined that from her alleged onset date Ms. Novak experienced "at the worst, moderate symptoms from her mental impairment." (Tr. 19). As such, the ALJ found that Ms. Novak's impairment did not meet or equal the § 12.03 listing requirements. (Tr. 21).

Ms. Novak asserts that the ALJ failed to properly analyze her mental condition as required by 20 C.F.R. Pt. 220, Subpt. P, App. 1 § 1200. Ms. Novak specifically points out that the ALJ must consider "longitudinal evidence" and information and circumstances

surrounding Ms. Novak's attempts to work during the relevant time period. Ms. Novak asserts that she meets the listing requirement for the following reasons: continuous psychiatric treatment and counseling since 1996; continuous treatment with anti-psychotic medication; suffering from delusions and hallucinations over the same time period; suffering from emotional withdrawal and social isolation; barely any activities of daily living; marked difficulties in maintaining concentration, persistence, and pace; and repeated episodes of decompensation, each of extended duration.

The Commissioner counters that Ms. Novak's assertions rely heavily upon her own descriptions of her ability to function and the medical source statement submitted by Dr. Safdar--evidence rejected by the ALJ as not credible when compared to the record as a whole. The Commissioner further asserts that substantial evidence supports the ALJ's assessment. She notes that the treatment notes do not support the severity indicated in Dr. Safdar's medical source statement and three experts found Ms. Novak to have no greater than moderate limitations. The Commissioner points out that "[i]n appropriate circumstances, opinions from state agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources." See Social Security Ruling 96-6p. Further, "determining whether an individual's impairment reaches listing level is not an issue in which the opinion of a treating source is given controlling weight." Randolph v. Barnhart, 386 F.3d 835, 840 (8th. Cir. 2004) (citing 20 C.F.R. §§ 404.1527(e)(2) & 416.927(e)(2)).

The ALJ weighed opinion evidence to determine whether Ms. Novak's impairment satisfied § 12.03 listing requirements and when determining Ms. Novak's residual functional capacity. The court thus examines the ALJ's analysis of the evidence provided by Ms. Novak's treating physician, her social workers, her vocational counselor, and medical expert consultants.

### 1. Opinion Evidence

Ms. Novak asserts that the ALJ improperly evaluated the medical opinion evidence of treating physician Dr. Safdar, social worker Toni Neta, vocational rehabilitation counselor Ann Allinger, and medical expert Phillip A. Ascheman, Ph.D. The Commissioner counters that the ALJ gave appropriate and supported reasons for the weight he afforded the various evidentiary sources.

### a. Treating Physician

Ms. Novak asserts that substantial evidence in the record supports Dr. Safdar's opinion regarding her functional limitations. First, she consistently sought psychiatric treatment, took anti-psychotic medication, and underwent therapy for her impairment since 1996. Second, she exhibited paranoia, depression, social isolation, delusions, and auditory hallucinations over the course of her treatment. Ms. Novak wishes to emphasize that although the severity of her symptoms have ebbed and flowed throughout the course of her treatment, she has never been symptom-free. Third, her inability to participate in her Social Security appeal hearing corroborates her inability to respond appropriately in a work setting and to handle the pressures and stress of competitive employment. Fourth, Dr. Safdar's May 7, 2004 letter to the ALJ corroborates his questionnaire answers. Lastly, Ms. Novak asserts her own behavior, coupled with record evidence from her therapists and the Vocational Rehabilitation counselor, further support Dr. Safdar's assessment of her functional limitations.

The Commissioner emphasizes that Dr. Safdar's opinion as to Ms. Novak's functioning prior to beginning treatment with him in October of 2001 lacks probative value. The Commissioner further states that Dr. Safdar repeatedly indicated in his treatment notes that Ms. Novak was without depression, psychotic symptomology, and medication side-effects. Dr. Safdar also frequently noted that she was eating, feeling, and sleeping well. Commissioner contends that it was only when Ms. Novak reduced or stopped her medication that she experienced an exacerbation of her symptoms. The

Commissioner asserts that Dr. Safdar's checklist questionnaire responses were inconsistent with other record evidence that shows that Ms. Novak had some moderate symptoms, but was generally functioning at an acceptable level as evidenced by her consistent mid-50s GAF assessments.

The regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician. See 20 C.F.R. § 404.1527(d)(2). A licensed physician or a licensed/certified psychologist does qualify as an "acceptable medical source" for the purpose of establishing an impairment. 20 C.F.R. § 416.913(a). Whether the ALJ gives great or small weight to the opinions of treating physicians, the ALJ must give good reasons for giving the opinions that weight. Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001); 20 C.F.R. § 404.1527(d)(2). "A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citation omitted). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001).

Although medical opinions on the specific amount or hours of work a claimant can do are permitted and encouraged, treating physicians cannot opine as to whether a claimant can be gainfully employed. Smallwood v. Charter, 65 F.3d 87, 89 (8th Cir. 1995). Such conclusions are intended for the vocational expert as they exist "outside the medical province." Id. See also Nelson v. Sullivan, 946 F.2d 1314, 1316 (8th Cir. 1991) (noting that physician statements concerning a claimant's potential for gainful employment do not constitute medical opinions, but opinions on the Social Security Act's application). Moreover, a treating physician's opinion does not deserve controlling weight when it is nothing more than a conclusory statement. Piepgras v. Chater, 76 F.3d 223, 236 (8th Cir.

1996). See also Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991) (holding that the weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements).

In the present case, the ALJ cites numerous evaluations by Dr. Safdar in his treatment notes of Ms. Novak that do not support the severe limitations indicated in Dr. Safdar's questionnaire. At their first meeting, on October 22, 2001, Dr. Safdar noted that Ms. Novak "denied any psychotic symptomology, significant depression, problems with meds or any suicidal thoughts. She has been eating, feeling and sleeping well." (Tr. 240). On February 14, 2002 Dr. Safdar reported that Ms. Novak denied any paranoia or psychotic symptoms and reported no problems with her medication. (Tr. 290). In July 2002 Dr. Safdar noted that the medication appeared to help Ms. Novak and sleep and appetite were fairly good. (Tr. 287, 284). At her most recent visit indicated in the record, Dr. Safdar found that Ms. Novak was "doing and felling a little bit better. She feels a little less anxious on the Xanax. She still gets a little anxious and apprehensive at times. She denies any suicidal thoughts. Sleep and appetite has been fair." (Tr. 302). Further, as indicated previously, the record as a whole reflects numerous times throughout Ms. Novak's treatment where she independently changed her dosage, in connection with which symptoms such as racing thoughts and auditory hallucinations often appeared. (Tr. 214, 240, 246, 280, 283, 294).

The court finds that the ALJ properly found Dr. Safdar's medical source statement unsupported by clinical findings and/or laboratory studies contained in the treatment records and inconsistent with the record as a whole. 20 C.F.R. 4041527(d), 416.927(d). An inconsistent opinion of a treating source should receive less deference. Johnson v. Chater, 87 F.3d 1015, 1018 (8th. Cir. 1996) (citing Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995)).

## b.  Other Sources

An ALJ may also consider evidence from "other sources" to demonstrate the severity of a claimant's impairments and consequent effect on one's ability to work. 20 C.F.R. § 416.913 (d).  Therapists, physician's assistants, nurse practitioners, and social workers qualify as such "other sources."  Id.

Ms. Novak argues that Social Security regulations required the ALJ to consider the opinions and records of her treating therapists and the Vocational Rehabilitation counselor. 20 C.F.R. § 416.913.  The Commissioner counters that Ms. Novak's therapist, Ms. Neta, and the Vocational Rehabilitation counselor, Ms. Alliger, are not acceptable medical sources whose opinions could form the basis of a disability finding pursuant to 20 C.F.R. §§ 404.1527, 416.927.  The Commissioner notes that Ms. Neta's opinion may be considered "other evidence," regarding which the ALJ has "more discretion and is permitted to consider any inconsistencies found within the record."  Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005). As Ms. Alliger's opinion constitutes a non-medical source, the ALJ was not required to evaluate her opinion under 20 C.F.R. §§ 404.1527, 416.927.

As noted by the Commissioner, the ALJ still gave supported reasons for the weight he afforded Ms. Neta and Ms. Alliger's opinions.  The ALJ gave Ms. Neta's opinion little weight because: (1) Ms. Neta's opinion was not based on current observations as she had not seen Ms. Novak since the previous September; (2) Ms. Neta's statement regarding Ms. Novak's work limitations conflicted with her previous observation that the claimant functioned better when her life had the additional structure imposed on her when she attended college classes; (3) Ms. Neta could comment on Ms. Novak's ability to function, but the ALJ did not have to accept Ms. Neta's conclusion that Ms. Novak could not work.  Thus Ms. Neta's opinion was not entitled to deference under Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)(indicating that discretionary application of the statute belongs solely to the Commissioner).

The ALJ afforded little weight to Ms. Alliger's opinion because there was "nothing in the record to indicate what qualifications Ms. Alliger has to render such an opinion" and that he found her opinion to be "based primarily on [Ms. Novak's] self-reported symptoms." The Commissioner points to Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993), where the court found an ALJ may justifiably discredit the opinion of even a treating physician where the treating physician's opinion is based solely on claimant's subjective complaints. The Commissioner argues that such a rule applies equally to Ms. Alliger's opinion. The court will not disturb the ALJ's decision regarding relative weight assignments given to Ms. Neta and Ms. Alliger's opinions.

### c. Medical Consultants

The ALJ also considered the assessment of state agency medical consultant Dr. Wright, affirmed by Dr. Olson, and the findings of Dr. Ascheman. Ms. Novak argues that the ALJ improperly relied upon Dr. Ascheman's findings because Dr. Ascheman did not observe, examine, or treat her. She further notes that Dr. Ascheman was unable to review her answers to the written interrogatories submitted post-hearing and that it is unclear whether he reviewed her written affidavit prior to the hearing. In response, the Commissioner notes that the ALJ may consider the opinions of expert medical advisors regarding the nature and severity of Ms. Novak's impairment. 20 C.F.R. 416.927(f)(2). According to Social Security Ruling 96-6p, the ALJ considers the consultants' opinions as the opinions of "nonexamining physicians." Further, the Commissioner points out that "[i]n appropriate circumstances, opinions from State agency medical and psychological consultants . . . may be entitled to greater weight than the opinions of treating or examining sources." Id.

The ALJ found Drs. Wright and Olson's assessment entitled to substantial weight, but noted "their opinion was provided prior to [Ms. Novak]'s episode of decompensation in January 2003, and did not take into consideration how her decompensation affected her ability to function." The ALJ afforded "significant weight" to Dr. Ascheman's findings

34

because the expert's findings considered all relevant record evidence and took into account Ms. Novak's January 2003 decline in functioning. (Tr. 21). While Dr. Ascheman may not have reviewed the additional written interrogatories submitted by Ms. Novak, the ALJ considered Ms. Novak's written answers in his decision. The court finds that the ALJ properly considered and weighed the opinions of agency consultants with the opinions of Ms. Novak's treating physician, therapist, and vocational rehabilitation counselor. The court will not disturb the ALJ's § 12.03 listing determination.

Where the ALJ finds that a claimant does not meet the severity requirements of a listing, the ALJ then assesses the claimant's residual functional capacity. 20 C.F.R. § 416.920a(d)(3).

### D. Residual Functional Capacity

Determining a claimant's residual functional capacity is a medical question. Lauer v. Apfel, 245 F.3d 700 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). "The Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." McGivney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). However, the record "must include some medical evidence that supports the ALJ's residual functional capacity finding." Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (citing Anderson, 51 F.3d at 779); Lauer, 245 F.3d at 704 (noting that while the ALJ was not "limited to considering medical evidence," the ALJ was "required to consider at least some supporting evidence from a professional."). "The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole." Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000). Further, an ALJ "may not draw upon his own inferences from medical reports." Lund v. Weinberger, 520 F.2d 782, 785 (8th Cir. 1975). "If the ALJ did not believe, moreover, that the professional opinions available to him were sufficient to allow him to form an opinion, he should have

further developed the record to determine, based on substantial evidence, the degree to which [the claimant's] mental impairments limited his ability to engage in work-related activities." Lauer, 245 F.3d at 706 (citing Nevland, 204 F.3d at 858; 20 C.F.R. § 404.1519a(b)).

As part of determining Ms. Novak's mental residual functional capacity, the ALJ considered opinion evidence (addressed in the previous section) and evaluated the credibility of her subjective allegations. After determining Ms. Novak's RFC, the ALJ posed a hypothetical to the vocational expert incorporating Ms. Novak's RFC limitations. Ms. Novak disputes the ALJ's credibility finding and argues that the ALJ constructed a hypothetical that did not include all of her limitations.

### 1. Credibility Determination

Ms. Novak claims that the ALJ failed to evaluate her credibility according to Polaski standards. See Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984). The Commissioner counters that the ALJ considered Ms. Novak's subjective complaints and properly discounted such complaints due to inconsistencies between her allegations and the record as a whole.

When evaluating the credibility of a claimant's subjective complaints, the ALJ may not disregard them "solely because the objective medical evidence does not fully support them." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). "The [ALJ] is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." Id. In evaluating claimant's subjective impairment, the following factors are considered: (1) the applicant's daily activities; (2) the duration, frequency and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. Id.

However, "a claimant need not prove that he or she is bedridden or completely helpless to be found disabled." Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir.

1989)(citations omitted). See also Keller v. Shalala, 26 F.3d 856, 859 (8th Cir. 1994). (finding it error to discredit the claimant's subjective complaints of pain based on her daily activities which consisted of watching television, taking care of her dogs, and doing household chores, which claimant testified she could not do when she was suffering from a disabling headache); Forehand v. Barnhart, 364 F.3d 984, 988 (8th Cir. 2004). ("We have long stated that to determine whether a claimant has the residual functional capacity necessary to be able to work we look to whether she has 'the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" (citing McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)).)

Ms. Novak argues that her subjective allegations support her inability to perform competitive employment, are consistent with the opinion of her treating physician, and are consistent with the record generally. Ms. Novak asserts that the ALJ improperly found Ms. Novak's allegation of total disability not credible due to lack of support from the objective medical evidence. Further, Ms. Novak states that the ALJ's mistakenly found her ability to engage in personal activities such as cooking, cleaning, and hobbies as inconsistent with a disability finding. Ms. Novak states such ability does not constitute substantial evidence that Ms. Novak has the functional capacity to engage in substantial, gainful activity. Ms. Novak also states that although the ALJ noted that she had taken dance lessons, worked part-time, and performed volunteer work after her onset date, the ALJ failed to acknowledge that these activities lasted no more than a few months and were sporadic in nature.

The Commissioner counters that the ALJ considered Ms. Novak's subjective complaints and alleged limitations and specifically addressed her claims with specific reasons why he found such claims not credible. The Commissioner further asserts that the ALJ's findings were supported by substantial evidence on the record as a whole.

The court examined the ALJ's rationale for his credibility determination, noting that where an ALJ seriously considers but for good reasons explicitly discredits a plaintiff's subjective complaints, the court will not disturb the ALJ's credibility determination. Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001)(citations omitted). First, the ALJ found that objective medical evidence did not support Ms. Novak's subjective allegations. Ms. Novak has never been hospitalized or been incapable of living independently. Her most recent treatment records from January 2004 indicate that her psychotic symptoms had improved with Risperdal and her anxiety helped by Xanax. Ms. Novak's GAF reflected the mild to moderate range for the majority of the time that Ms. Novak received treatment.

Second, the findings of state agency medical consultants and the testimony of the medical expert do not support Ms. Novak's allegations. As detailed previously, the consultants and medical expert found Ms. Novak to possess only mild to moderate restrictions. Even Dr. Safdar's assertion that Ms. Novak possessed "marked" limitation in several areas of work-related functioning indicated that Ms. Novak "was seriously affected but not precluded." Third, Ms. Novak claimed her disability onset date as November 15, 1999. In addition to performing personal activities such as cooking, cleaning, and hobbies, Ms. Novak completed her college courses and obtained her college degree in May 2002, well after her onset date. She performed temporary accounting jobs in 2000 and 2001. In 2002, Ms. Novak performed volunteer work doing taxes for poor people. She also worked at Midwest Janitorial Services from September 2002 through February 2003.

Fourth, the ALJ noted the medical expert's finding that even though Ms. Novak had independently modified her medication during the course of her treatment, she retained the ability to perform at least simple work tasks. Lastly, the ALJ determined that Ms. Novak's ability to perform daily activities and live independently are inconsistent with her allegation of total disability. The court finds that the ALJ properly evaluated

Ms. Novak's subjective impairment under the Polaski factors and provided detailed support for his credibility findings.

## 2.  Improper Hypothetical Question

Ms. Novak asserts that the ALJ improperly relied on the vocational expert's response to a hypothetical question that did not include all of her limitations.   The Commissioner asserts that the ALJ excluded from Ms. Novak's RFC only those limitations which he found not credible or unsupported by the record as a whole.

An improper hypothetical cannot serve as substantial evidence.   Whitmore v. Bowen, 785 F.2d 262, 263-64 (8th Cir. 1986).  The hypothetical should precisely describe the claimant's impairments in order for the expert to properly evaluate the availability of jobs the claimant can perform.   Newton v. Chater, 92 F.3d 688, 694-95 (8th Cir. 1996). However, the question need only include impairments supported by substantial evidence and not impairments rejected by the ALJ as untrue.   See Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997).   "Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits.   Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) ("These assessments alone [of non-treating physicians] cannot be considered substantial evidence in the face of the conflicting assessment of a treating physician."   Id. (citing Henderson v. Sullivan, 930 F.2d 19, 21 (8th Cir. 1991)); Baker v. Apfel, 159 F.3d 1140, 1144 (8th Cir. 1998) ("If a hypothetical question does not include all of the claimant's impairments, limitations, and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability.").

As indicated in the previous sections, the court will not disturb the ALJ's opinion evidence analysis or credibility findings.  The ALJ disregarded hypotheticals that included limitations unsupported by the record as a whole, i.e. Dr. Safdar's assessment on the Medical Source Statement discussed previously.  The ALJ's hypothetical included only those "concrete consequences" of Ms. Novak's impairments, and thus constitutes

substantial evidence.  Pickney v. Chater, 96 F.3d 294, 297 (8th Cir. 1997).  The court will not reverse the ALJ's findings and reliance upon a hypothetical containing limitations supported by substantial record evidence.

Upon the foregoing,

IT IS ORDERED that the determination of the ALJ is affirmed and this matter is dismissed.

August 4, 2006.

JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT